[Civ. No. 26908.   Second Dist., Div. Three.   May 15, 1963.]

NATIONAL AUTOMOBILE & CASUALTY INSURANCE COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CHARLES R. GARDNER, Respondents.

Clopton & Penny and Floyd L. Colvin for Petitioner.

Everett A. Corten, Edward A. Sarkisian and William A. Parsons for Respondents.

FORD, J.—By this petition, National Automobile & Casualty Insurance Company seeks the annulment of a workmen's compensation award made to Charles R. Gardner by the Industrial Accident Commission. In our opinion the award was proper under the governing law.

On August 17, 1957, Gardner was employed as a truck driver and swamper by the Ogier Hay and Grain Company. He sustained an injury to his back while working within the course and scope of his employment. In the course of proceedings before the Industrial Accident Commission with respect to that injury, a recommended permanent disability rating of 52 per cent was made after apportionment of 20 per cent of permanent disability of 65 per cent to preexisting pathology. On March 20, 1959, the commission made an order approving a compromise and release with respect to the claim; thereunder Pacific Employers Insurance Company, the compensation insurance carrier for the employer, paid the sum of $8,100, in addition to all sums theretofore paid.

On August 16, 1960, Gardner was an employee of J. P. Lamaison. He sustained a second injury to the same general area of his back while working within the course and scope of his employment. The petitioner herein, National Automobile & Casualty Insurance Company, was the compensation insurance carrier for the employer. The findings and award made by the Industrial Accident Commission were based upon a permanent disability rating with respect to the back of 78 per cent, half of which was apportioned to preexisting causes and the remaining 39 per cent to the injury of August 16, 1960.

The compensation insurance carrier, petitioner herein, filed with the commission a petition for a rehearing and contended that the amount of the disability found to exist in 1959, which was 65 per cent, should be deducted from the amount of the current disability, which had been determined to be 78 per cent. The petition was denied. In the course of its opinion the commission stated in part as follows: ''The

point would be valid except for the fact that applicant testified, without contradiction, that he stopped wearing a back brace in 1959; that by the time he went to work for the defendant employer in 1959, all of his symptoms had disappeared; and that he had no back pain of any kind and was able to lift 150 pounds of hay without hurting himself. Although we are unable to accept the thesis that applicant had recovered from his 1957 injury, we can not ignore the fact that applicant quit wearing his back brace in 1959, and that prior to the present injury, he was able to lift 150 pound bales of hay. The implication is inescapable that there was a material improvement in applicant's condition."

The petitioner reasserts its contention here and argues that the basis of the award should not exceed the difference between the extent of the disability as found on the first occasion (65 per cent) and as found on the second occasion (78 per cent), namely, 13 per cent. It is further argued that "the total disability could not in any case exceed 26%, or the difference between 52% for which the applicant was fully compensated on the first injury in March 1959 and the total disability, or 78%, found to exist in 1962," and that, if the opinion of the independent medical examiner was to be followed, only half of the 26 per cent should be charged to the second injury.

Guidance as to the proper application of section 4750 of the Labor Code[1] in the solution of the problem presented in this case is found in the reasoning of *State Compensation Ins. Fund* v. *Industrial Acc. Com.*, 59 Cal.2d 45 [27 Cal. Rptr. 702, 377 P.2d 902]. ▪ After making reference to *Gardner* v. *Industrial Acc. Com*, 28 Cal.App.2d 682 [83 P.2d 295], and *Pacific Gas & Elec. Co.* v. *Industrial Acc. Com.*, 126 Cal.App.2d 554 [272 P.2d 818], the Supreme Court stated (59 Cal.2d at p. 51): "It is not the location of the injury which is important but rather the nature of the disability resulting from the injury." ▪ It was fur-

---

[1]Section 4750 of the Labor Code is as follows: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment.

"The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

ther stated (59 Cal.2d at pp. 52-53): "Attention should be directed to the elements involved in a compensable permanent disability. A permanent disability is one '. . . which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market.' (2 Hanna, Employee Injuries and Workmen's Compensation (1954) p. 255. See Lab. Code, § 4660, subd. (a).) . . .

■ "When there has been no loss of a member of the body or loss of its function, it is necessary as a prerequisite to compensation that the injury result in a decrease in earning capacity or the ability to compete in the open labor market. If a subsequent injury does not have such an effect it should not be compensable. ■ Stated another way, the disability resulting from a subsequent injury should be compensable only to the extent that it can be said that the employee's earning capacity or ability to compete has been decreased from what it was immediately prior to the second injury. The computation of this figure cannot be determined by a mechanical application of a method of apportionment based upon whether the injury occurs to the same anatomical part of the body. It must come from a consideration of the nature of the disability caused by the injury." ■ In applying the governing law to the facts of the case before it, the Supreme Court said (59 Cal.2d at pp. 53-54): "To the extent that the factors of disability due to both injuries overlapped, that is, to the extent that the second injury did not further reduce his earning capacity nor his ability to compete in the open labor market, he should not be compensated twice. . . . If the prior condition be disregarded the result will be that the employer, or his carrier, will be held liable for a disability greater than was actually produced by the injury."

In *Gardner* v. *Industrial Acc. Com.*, *supra*, 28 Cal.App.2d 682, the petitioner had sustained a permanent disability of the left foot, consisting of partial stiffness of the ankle joint, amounting to 12 per cent. Thereafter he sustained a second injury which made necessary the amputation of the left leg between the knee and hip joint. The commission determined that the total permanent disability thereafter existent amounted to 58¾ per cent but that, inasmuch as petitioner had sustained a prior permanent disability amounting to 12 per cent, the amount of 12 per cent was to be deducted

from the total of 58¾ per cent. The amount of permanent disability attributable to the second injury was determined to be 46¾ per cent. In affirming the award the court said (28 Cal.App.2d, at p. 684): ". . . the Industrial Accident Commission is not authorized, in computing the percentage of permanent disability of an employee caused by an industrial injury, to include any percentage of such disability attributable to a prior industrial or nonindustrial disease or injury; nor is it justified in including in an award any amount as compensation for the disability attributable solely to the prior injury or disease and for which the employment was in no wise responsible."

The record in the present case must be reviewed in the light of the law heretofore discussed. On August 16, 1960, Gardner was employed by J. P. Lamaison as a truck driver. He testified that he had worked for Lamaison for about five months. Before that, he had been engaged in his own ceramics business for about a year. In the course of his duties for Lamaison he loaded and unloaded baled hay which was transported on the vehicle that he operated. The length of the truck and trailer was 60 feet. The bales, which he lifted by use of hooks, weighed from 150 to 180 pounds. On this job he had not had any trouble with his back prior to the injury of August 16, 1960, and had received no treatment while so employed for the period of five months. After the injury of 1957 his back "just gradually got better." Gardner further testified: "Well, when I went to work for Mr. Lamaison, there was no pain of any kind or I couldn't have done the work." He said that he had no restrictions of any kind at that time.

On August 16, 1960, while the truck was being loaded another man "put a bale up there" and gave it "a jerk back towards him." Gardner, who was on the truck and was holding the bale with a hook, was jerked "sideways." He felt a burning pain in the middle of his back. The previous trouble with his back was at a lower point. Since the second accident he had been unable to work because of sharp pain which occurred when his back was placed in motion; a dull pain was constantly present when the back was not in motion. In addition, he had pain between his shoulders, and his right leg was in a worse condition than it was before the second injury. He could only lift articles weighing about 10 or 15 pounds.

Dr. J. Gordon Bateman was appointed as an independent

medical examiner. In the report of his examination which was made on December 9, 1960, he stated in part: "He certainly had a vulnerable back at the moment of his injury of August 16, 1960. However, the patient's testimony as recorded regarding his condition immediately pre-injury is reasonable, and consistent with his pre-injury condition. He would, however, have trouble from time to time as a result of the injury of August 17, 1957, and in fact, his back condition at that time was really not such as to permit him to drive a hay truck and load the hay. He did, however, sustain another injury and this seems to be a separate and distinct type of injury, . . ." On March 8, 1962, Dr. Bateman again made an examination of Gardner. In his report he stated in part: "His condition does require apportionment, inasmuch as he is so much worse now than he was at the time of the accident of August 1960. It is felt that 50% of his present disability is the result of the pre-existing arthritis and the progression thereof, and the previous injury of August 1957, and 50% of his disability the result of the injury of August 1960. . . . He is certainly restricted to sedentary work but will not be able to engage in this work without considerable restrictions and interruptions." Under cross-examination Dr. Bateman was asked to assume certain facts and then to express an opinion as to whether there had been "any increase in disability between March of 1959" and the time of the witness' examination of March 8, 1962. Dr. Bateman said that the condition was "somewhat worse" and further stated: "It is not twice as bad, it is perhaps 10 to 25 per cent worse, 25 per cent worse . . . at the time of my March, '62 exam." Further testimony of Dr. Bateman was as follows: "Q. So far as his ability to engage in the type of occupation that he has in the past, is there any difference . . . in the pathology or his physical condition in 1959, in March, then [sic] there was when you examined him in March of 1962? A. Slightly worse in March 1962 than in March, 1959. . . . Ten to 25 per cent."[2] The witness further said that about 10 per cent of the increase in disability in the period stated was due to natural progression of the arthritic condition. Thereafter, Dr. Bateman testified as

[2]It is argued that this testimony was inconsistent with other evidence given by Dr. Bateman. However, as noted in the opinion of the commission upon denial of the petition for reconsideration, this particular portion of the cross-examination of Dr. Bateman failed to give any consideration to the history of improvement of Gardner's condition after the first injury and before the second injury.

follows: "50 per cent of his disability is due to the injury of August 16, 1960, . . . 20 per cent is due to the pre-existing osteoarthritis and natural progression thereof, such as detailed from January, '59 'till September, '60, and 30 per cent is due to the injury of August, 1957, without regard to the aggravation that that injury did on the arthritis." The witness further stated that within the 20 per cent previously mentioned was the progression of the arthritis "up to the injury of 1960, and its natural progression subsequent to the injury of 1960, but did not include the . . . aggravation of the arthritis by the injury of 1960, which would be included in the second 50 per cent."

This court is governed by the rule that the determination of the weight of the evidence and the credibility of the witnesses is within the province of the commission. (*Keeley* v. *Industrial Acc. Com.*, 55 Cal.2d 261, 265 [10 Cal.Rptr. 636, 359 P.2d 34].) That rule is applicable with respect to the reports and testimony of examining physicians. (*Havel* v. *Industrial Acc. Com.*, 154 Cal.App.2d 737, 742 [316 P.2d 680].) If substantial evidence supports the commission's findings, this court is not authorized to disturb them. (*State of California* v. *Industrial Acc. Com.*, 196 Cal.App.2d 10, 17 [16 Cal.Rptr. 323].) It is not necessary to set forth in this opinion all of the evidence produced through expert witnesses; with reference to the matter of whether the employee Gardner's condition had improved since the disposition of the proceeding with respect to the first injury, the commission was entitled to consider the employee's testimony as against that of medical experts. (See *American Can Co.* v. *Industrial Acc. Com.*, 196 Cal.App.2d 445, 450 [16 Cal.Rptr. 424].) Gardner's testimony was sufficient to sustain the inference that there had been a substantial improvement of his bodily condition in the period of time which elapsed prior to the second injury. Furthermore, Dr. Bateman was warranted in assuming that such improvement had occurred and in considering that matter as a factor in reaching a conclusion as to the portion of the disability existing after the second injury which was attributable to each injury.

In the opinion of the Supreme Court in *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d 45, it was noted that in that case there had been no improvement in the employee's condition which arose from the first injury. However, the relevancy of the matter of such improvement

was recognized in the following paragraph of the opinion (59 Cal.2d at p. 56): "It can, of course, be argued that if the injuries sustained in the first accident heal or improve, then there will remain at least a 26 per cent disability caused by the subsequent injury for which no compensation has been paid. This may be so. But this is a factor that should be found as a fact, based on evidence. It was not here found. It is a factor that, upon proper evidence, the commission may consider when it reappraises the existing disability in accordance with the view herein expressed."

In view of the evidence of improvement in Gardner's condition heretofore discussed, the method of apportionment followed by the commission in the present case was consonant with the reasoning of the Supreme Court in *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d 45. The commission reached a fair and correct result in the application of section 4750 of the Labor Code and this court is not free to interfere with that determination.

One other matter remains for consideration. It is urged that it was error to make the additional award of medical care in the form of "lifetime furnishing of a back support." It is argued that the evidence showed that the necessity for the back support was due to the condition which existed before the second injury. In the report of his examination of March 8, 1962, Dr. Bateman said that Gardner would continue to need the back support he was then wearing. He further stated: "The need for this back brace has been re-established by the injury of August 1960, but it is my understanding that the patient was in need of this type of support prior to this injury, even though he had a temporary regression of symptoms and was not wearing it at the time of the accident or for some time before same." During the course of the cross-examination of Dr. Bateman, he was asked to express his opinion as to whether "any part of the necessity for wearing the back support" was due to the second injury, and he answered: "Yes. The need for wearing it was re-established or precipitated again by the injury of August, 1960, although even prior to that injury, although he didn't wear a brace, he needed it, he shouldn't discard it, but rather put it on the shelf." The commission was warranted in considering that testimony in the light of the actual experience of Gardner. He testified that he wore the brace for a period of about six months in 1959 as a result of his first injury; when he went

to work for Lamaison he was not wearing it and had not done so for about six months. Reference has heretofore been made to other testimony of Gardner as to his physical condition at the time he became an employee of Lamaison. Under the governing law heretofore stated, this court is not free to interfere with the commission's determination that the need for the resumption of the wearing of the back support was caused by the second injury.

The award is affirmed.

Files, J., concurred. Shinn, P. J., concurred in the judgment.

Petitioner's application for a hearing by the Supreme Court was denied July 10, 1963.